UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

Dr. Keith E. Pyne and Enrico Desiata,  :
                                       :
                        Plaintiff,     :        Index No. 1:21-cv-1565
                                       :
        -against-                      :
                                       :
CKR LAW LLP and JEFFREY A. RINDE, ESQ., :        **COMPLAINT**
                                       :
                        Defendants.    :        **JURY TRIAL DEMANDED**
                                       :
                                       :
                                       :
———————————————————————— X

Plaintiffs Dr. Keith E. Pyne ("Dr. Pyne") and Enrico Desiata ("Desiata") (collectively, "Plaintiffs"), by their undersigned attorneys, for their Complaint against Defendants CKR Law LLP ("CKR") and Jeffrey A. Rinde, Esq. ("Rinde") (collectively, "Defendants"), allege as follows:

## I.        NATURE OF THE ACTION

1.        This action arises from a repeated and ongoing scheme perpetrated by Defendant Jeffrey A. Rinde, an established attorney at all relevant times practicing in New York, and his law firm CKR Law, LLP, a limited liability partnership formed under the laws of the State of California with its principal place of business at 1330 Avenue of the Americas, New York, New York.

2.        By and through a variety of complicated corporate entities that Defendants represented to Plaintiffs were legitimate, and individuals with whom Defendants were conspiring but who Defendants represented were engaged in legitimate activity, Rinde and CKR executed a plan to defraud Plaintiffs, and inevitably other victims, of hundreds of thousands of dollars based upon promises of a return of millions, through fraudulent investment programs requiring an

advance fee. The suspect entities and individuals include, but are not limited to, Straightline L.L.C. (hereinafter, "Straightline"), Ault Capital L.L.C. (hereinafter, "Ault Capital"), Mark Datwani, David Ault, and Rick Siegel.

3.      Straightline, with its principal place of business in North Oaks, Minnesota, purports to provide financing solutions for projects requiring $10M (ten million USD) to $1B (one billion USD) in funding.

4.      Ault Capital, with its principal place of business in Estero, Florida, seems simply to be a new or shadow company engaged in, or the owner of, Straightline.

5.      Defendants' highly-sophisticated scheme was in essence an advance fee scheme disguised to appear to be a legitimate investment and loan operation crafted by Defendants to reap enormous profits, all at the expense of Plaintiffs who, at all times, entrusted Defendants to provide guidance and eventually legal advice.

6.      At its core, Defendants' scheme included:

    a.  Offering returns on investments that were disproportionate to the risk involved;

    b.  Mimicking legitimate financial instruments;

    c.  Asking for payment of an advanced fee prior to funding or initiating the loan or investment (represented by Defendants to be the total price that would be required to enter into the agreements alleged below);

    d.  Transferring funds overseas and using foreign banks;

    e.  Improper referencing to legitimate financial institutions without the financial institutions' knowledge or consent;

     f.   Intricate explanations and excuses as to why the promised funds or returns failed to materialize; and

     g.   The use of escrow accounts, including attorney escrow accounts.

7.     In essence, Defendants offered Plaintiffs millions of dollars profit from funds that Defendants enticed Plaintiffs to extend. Plaintiffs were required to put hundreds of thousands of dollars in escrow to act as collateral in order to process the transactions alleged herein. Upon information and believe, the funds were never used for the purpose represented by Defendants, the returns promised to Plaintiffs were never made, and the escrow amount was never returned.

8.     This is an action by Plaintiffs to recover damages owed to them by Defendants for (1) breach of contract; (2) breach of fiduciary duty; (3) fraud and misrepresentation; and (4) unjust enrichment, all of which occurred in the course of the Defendants' representation, including legal representation, of Plaintiffs in purported trading agreements and a settlement agreement.

9.     Defendants misrepresented their ability to collect and distribute proceeds in accordance with the trading agreements and misrepresented the expected profitability of the agreements or, alternatively, misrepresented their intentions and activities in their entirety.

10.     Defendants failed to deliver any proceeds from the transactions, or, alternatively, obtained the funds but instead retained the proceeds for themselves and others with whom they were conducting the fraud.

11.     As a result of Defendants' actions, Plaintiffs have been harmed financially and seek to recover the damages in the amount Rinde has represented and admitted that Defendants owe Plaintiffs.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and the Plaintiffs and Defendants are citizens of different states.

13.     This Court has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(1)(a) because Defendants regularly and continuously operate and conduct business in this jurisdiction.

14.     Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(2) as a substantial number of the events, acts or omission giving rise to Plaintiff's claims occurred within the boundaries of this judicial district.

## III.     THE PARTIES

15.     Dr. Keith E. Pyne is an individual residing in Phoenix, Arizona.

16.     Enrico Desiata is an individual residing in Panama.

17.     CKR Law LLP is a global law firm formed as a limited liability partnership with an office and principal place of business located in New York County, New York.

18.     Jeffrey Rinde, Esq. is a named partner, co-founder, and, at all times relevant to this action, the managing partner of CKR.  Rinde works, or at all relevant times worked, in CKR's office in New York County, New York.  In addition, the services Rinde performed on behalf of Plaintiffs, alleged herein, happened substantially in New York County, New York.

## IV.     BACKGROUND FACTS

19.     In or around August 2014, Mark Datwani, a resident of Panama and business associate of Desiata's, approached and convinced Desiata to participate in a purported financing for a company in which Datwani and Datwani were equity partners, Panasolar Generation S.A ("Panasolar").

20.     Datwani represented that he was investing $900,000, and convinced Desiata to invest $500,000, and, in turn, Dr. Pyne was convinced to invest an additional $200,000. Datwani, who, upon information and belief, was working on behalf of or in conjunction with Defendants, explained to Desiata that the funds would be invested in a trading platform purportedly crafted or operated by Rick Siegel ("Siegel") and David Ault ("Ault") of Straightline.

21.     Datwani explained to Desiata that the financing could be used to provide funding for Panasolar and as an investment.

22.     On August 31, 2014, Defendants CKR and Rinde were retained ("Initial Engagement Letter") to represent the parties in structuring the trading platform.

23.     In about August 31, 2014, Rinde was engaged to effectuate the purported trading agreement.

24.      The financing and loan transaction purportedly closed on September 2, 2014, and was entitled the "Private Contract Agreement (PCA) for Lease of Bank Instrument(s)" ("PCA").

25.     Although the structure, the parties, and the flow of money is still partially unknown, Datwani, and subsequently Rinde, represented to Plaintiffs that Rinde had negotiated, a trading agreement between AIZ Energy SA ("AIZ") and Paramount Services Ltd. ("Paramount"), a Nevis corporation.  The trading agreement involved a trade platform that would be funded by money obtained as a loan secured by an SBLC.

26.     As part of the transaction, the parties entered into an escrow agreement whereby Plaintiffs' investments would be transferred into an escrow account controlled by CKR and then used to obtain and monetize the SBLC.

27.     Defendants represented that, pursuant to the PCA, Plaintiffs' funds would be used to lease an SBLC, which purportedly had been issued by Barclays Bank PLC, a bank located in the United Kingdom, to AIZ, and that the SBLC in turn would be used as a guarantee in order to monetize funds to invest in a trade platform.

28.     Defendants represented that, pursuant to the PCA, Plaintiffs' funds would be used to lease an SBLC, which purportedly had been issued by Barclays Bank PLC, a bank located in the United Kingdom, to AIZ, and that the SBLC in turn would be used as a guarantee in order to monetize funds to invest in a trade platform.

29.     On September 3, 204, Dr. Pyne provided via wire and check $200,000 to CKR for the purpose of funding the SBLC and investment. On September 4, 2014, Desiata wired $500,000 to CKR for the purpose of funding the SBLC and investment.

30.     On September 9, 2014, Defendants crafted a trade agreement, entitled the Joint Participation Agreement ("Trade Agreement"). This agreement purportedly was with Anderson Investments International, LLC ("Anderson"), a limited liability company, which, upon information and belief, is incorporated in Nevis, and, upon information and belief, is related to Paramount.

31.     Under the Trade Agreement, according to Defendants, AIZ agreed and ultimately loaned Anderson $20,825,000 of proceeds purportedly reaped, at least in part, from the PCA to

invest.  In return, over a period of 90 days, Anderson would provide AIZ with payments "equal to 25% of the return generated."

32.     On October 1, 2014, Datwani passed away.  Unbeknownst to Dr. Pyne and Desiata, Datwani had never invested any funds in connection with the Trade Agreement, as Plaintiffs had done.

33.     On November 7, 2014, Desiata, on behalf of himself and Dr. Pyne, entered into a contract ("Follow-Up Engagement Letter") to continue Defendants' legal services, including to represent and "assist … in connection with its Lease of an SBLC, assistance in monetizing the bank instrument and working with [Panasolar's] bank compliance officers to facilitate the receiving and acceptance of cash funds in to [Panasolar's] bank accounts."   Desiata signed the retainer agreement in New York County, and the parties agreed to a retainer of $50,000, $25,000 of which was intended to cover Rinde and CKR's previous work on Plaintiffs' behalf and the remainder to commence work pursuant to the Follow-Up Engagement Letter.

34.     Desiata intended to use his distributions to build Panasolar's solar plant and grow the business.  Dr. Pyne intended to use his distributions to invest in medical hemp research, an industry which was still in its early stages.

35.     Dr. Pyne and Desiata never received any distributions to which they were entitled, despite Rinde's numerous representations that they would receive the funds:

> a.  On November 18, 2014, Desiata emailed Rinde to ask when they could "start sending something to the bank?"  Rinde responded, "Prior to the end of the week."  However, by November 22, 2014, Plaintiffs still had not received any distributions, and Rinde told Desiata that he was

working with the bank to "address [an AML matter] with the relevant parties and regulatory authorities."

b. Almost a week later, Plaintiffs still had not received distributions from the Trade Agreement. On November 28, 2014, Rinde wrote, "I was advised that the funds were received in HK and[,] subject to HKMA review[,] would be credited to my account by close of business Monday or Tuesday, HK time."

c. On December 3, 2014, Siegel wrote that on "11/28/14 [you] confirmed the money ha[d] hit the bank in Hong Konk [sic] and would be available in your account by Tuesday. On our call today you reaf[f]irmed that the 38 million has hit the bank, but you are now not sure when it will hit your account. … Can you please claify [sic]?" Rinde ignored the fact that he had missed his deadline and responded, "Correct. It says 'subject to HKMA review' it would be credited Monday or Tuesday. It is now though under HKMA review."

d. On December 5, 2014, Desiata wrote Rinde, "Today is Friday and [in] HK the week end has already started. Can you give me an update? The money should already be in your account. Can you confirm?" Rinde did not respond to Desiata's email.

e. On December 6, 2014, Siegel emailed Ault and Desiata that he had spoken with Rinde. He said that Rinde "confirmed that $38M has arrived at HSBC Hong Kong [and] he is working endlessly to have the HKMA (the Hong Kong Fed) release the money to his account. He

has assured me that we are going to get every dime of the $50M+ we have coming." Siegel also noted that Rinde indicated that it could take 30 days for to receive their distributions.

f.  On December 9, 2014, Plaintiffs still had not received any distributions, so Desiata requested that Rinde draft a letter explaining the situation so that he could "show … the bank and [the] engineering, procuring, and construction company" that Panasolar had sufficient funds to meet its obligations. On December 15, 2014, Rinde wrote a letter to Desiata confirming that Panasolar would receive distributions "in excess of $20 million."

g.  On December 18, 2014, Siegel wrote Ault and Desiata an email, copying Rinde, saying, "Jeff has confirmed the money will hit his account by the 30th of this month." Rinde did not reply to or correct the information in the email.

h.  On December 19, 2014, while asking for clarification of the terms of the Trade Agreement, Siegel noted that "there is an additional 16.5 million dollars for this past month, bring[ing] the total to 54.4 million dollars."

i.  Plaintiffs waited for the distribution, and, on December 28, 2014, Siegel emailed Rinde to confirm the details of the distribution. Shortly thereafter, Rinde replied and again changed the story: "I have responded to this question multiple times. I was advised that the funds would be credited to my account by the close of business on December

30th.  This date is subject to change as we are relying on third parties and matters outside our control.  Even assuming the funds are credited on the 30th, there is no possibility they [will be] wired … on Tuesday or Wednesday.  As we discussed last week, I will need to secure HKMA approval for the outbound transfer.  I cannot estimate the timing based on historical transactions as the global banking environment is in a constant state of flux."

j.  As of January 2, 2015, Plaintiffs still had not received any distributions.  Desiata wrote an email to Rinde: "As you know we are missing a series of deadlines, and you keep saying that this is out of your control[.] ... BUT … You have never given us enough explanations on why each single deadline is missed … [I am] [c]oncerned because I am starting to doubt we will ever get this money and I am pretty sure [Ault and Siegel] have the same feeling. … Conclusion: give me/us details on what is going on and what really do you expect[] to happen … I am still waiting [on] news from your guy in HK."  Rinde responded that "it appears that perhaps due to your lack of familiarity with this process you are expecting information which is extremely sensitive or unavailable other than verbally. … Due to the holidays I was only able to communicate with my HK contact today."

k.  By January 4, 2015, Plaintiffs still had not received any distributions.

36.  Plaintiffs have never received any proceeds from the Trade Agreement.

37.     Nonetheless, Rinde and CKR enticed Plaintiffs to remained engaged in the transaction and related transactions. Defendants assured Plaintiffs that Plaintiffs would obtain the promised returns on their investment.

38.     First, on January 15, 2015, pursuant to an agreement structured by Defendants, Plaintiffs entered into another purported trading agreement (the "40 Weeks Program"). Under the 40 Weeks Program, Plaintiffs made the proceeds that were purportedly generated by the previous trading agreement, but which Defendants still have not transferred to Plaintiffs, available to Anderson to invest. In return, Anderson agreed to provide monthly payments over a period of 40 weeks "equal to a minimum of 50% of the principal amount."

39.     Then, on September 23, 2015, while the 40 Week Program was in effect and Plaintiffs were waiting for distributions, Plaintiffs entered into a settlement agreement with Anderson ("Anderson Settlement Agreement"), also orchestrated by Defendants. Under the Anderson Settlement Agreement, Plaintiffs released their claims against Anderson related to their non-payments under the Trade Agreement in exchange for the return of their initial $700,000 investment. Plaintiffs designated Defendants to receive and distribute the $700,000.

40.     Dr. Pyne and Desiata never received any distributions to which they were entitled under the 40 Weeks Program or the Anderson Settlement Agreement. And once again, Rinde, along with Anderson, which was working with Rinde, made representations of imminent payments and provided excuses based upon purported bank review of transfers:

a.  Rinde contended that the funds were flagged for review by the banks. On October 13, 2015, Anderson emailed that "the funds will be release[d]." Subsequently, on October 26, 2015, Anderson again

emailed that Rinde "should receive [the 700k] this week."  Then on October 30, 2015, Anderson, "700k should be in today."

b.  On November 1, 2015, Rinde represented to Desiata that "there is no issue" with the funds, despite the fact that they had been flagged for review.

c.  The review continued through at least January 2016 but Rinde was not forthcoming with Plaintiffs about the status of their investments.  On January 13, 2016, Rinde represented that he expected the funds to be credited in a week.  On January 22, 2016, Rinde wrote, "I received confirmation from CITI they are holding funds for our benefit which includes your payment.  They indicated they are completing the process for crediting the[m] to our account."

d.  Thereafter, Rinde continued to represent that the funds would be available imminently.  On Aril 12, 2016, Rinde represented to Desiata that they "should expect the money to [arrive within] 7-10 banking days."

e.  On May 10, 2016, the funds still had not arrived, but Rinde told Desiata that he had "received a copy of the transfer instructions and [was] waiting for a copy of the transfer confirmation."  On May 12, 2016, he further advised that Anderson had "assured me that payment is forthcoming.  I have no reason to doubt their statements to me."

f.  On May 19, 2016, more than a week later, Plaintiffs still had not received the funds.  Rinde assured Plaintiffs that he would receive a confirmation "today or tomorrow."

g.  On May 23, 2016, Rinde represented that he still did not have the confirmation of the transfer but was working to "facilitate" the transfer.

h.  Months later, in October 2016, Plaintiffs still had not received their funds.  On October 24, 2016, Rinde represented that "there has been a lot of progress."

i.  By November 7, 2016, Plaintiffs still had not received any funds and Rinde wrote once again that "everything is progressing well."

j.  On November 23, 2016, Desiata wrote to Rinde that he was seeing no progress and asked Rinde to develop and implement a new strategy.  Rinde wrote once again that "[t]hings are progressing as needed to a final resolution.  There is no need to explore alternative plans."  By this point, for over a year, Rinde had represented that Plaintiffs would imminently receive their return of $700,000 from Anderson, and for more than two years represented that they would receive their proceeds under the trading agreements.  He also, for over a year, had represented that the funds were being reviewed and taking time to credit to his account.  However, Rinde was not producing any new communications from the banks to provide support for his assertions.

k.  On March 10, 2017, with funds still having not arrived, Desiata again emailed Rinde to find out about the status of the funds. Rinde simply responded that they could speak over the weekend, but did not address Desiata's concerns.

l.  On May 4, 2017, Desiata emailed Rinde again and noted that "following our last call two days ago, you said that the funds should be in your account 'today or tomorrow,' therefore I belive [sic] they already are in your account." Rinde responded by placing the blame on Desiata: "I think you misunderstood some of our conversation." At this point, Plaintiffs had not received any proceeds from the trading agreements, nor had they received the return of their initial $700,000 investment, which was agreed upon in the Anderson Settlement Agreement.

m.  In August 2017, Rinde claimed to be in Dubai, where, he represented, the funds were being held, to sort out any issues related to the funds and to facilitate the transfer of funds. On September 2, 2017, Rinde wrote Desiata, "Everything is approved."

n.  On September 25, 2017, the funds still had not been distributed to Plaintiffs. Rinde claimed, as he had previously, that the royal family of Dubai controlled the funds. Desiata wrote to Rinde, "I am incurring … unexpected expenses … and I really count on those money [sic]. [H]ow long do you think would it take after your meetings in Dubai to get some money in hand"? Rinde replied: "I was told I would be able

to transfer out once compliance requirements were satisfied.  However we still need to deal with receiving bank requirements."  When Desiata noted that he had understood compliance to have cleared, Rinde responded, "Not receiving bank compliance."

o. A month later, in and around October 6, 2017, when Desiata asked for an update, Rinde wrote, "Everything is going fine.  Will need to return in about 2 weeks to finish … They told me that was the time it would take to process the transfer and credit the funds to the accounts.  There was no point in me just sitting there until then."

p. Two weeks later, on October 23, 2017, Rinde represented that two of the three accounts had been credited with Plaintiffs' funds.  However, he explained, the money could not be sent out: "We've discussed this several times.  Once the funds are credited I need to return to speak to the bank management and the assigned bank officers on any costs, conditions to and the compliance required to effect the outbound transfers."  The third account would credit on November 8, 2017, Rinde represented.

q. On November 15, 2017, Rinde represented he would meet with the banks on November 27 and 28 to effectuate the transfer of funds to Plaintiffs.  However, by the end of December 2017, the meetings apparently still had not occurred.  On January 4, 2018, Rinde wrote Desiata, "Meetings are still ongoing through at least January 13."

r.  On January 14, 2018, Rinde again changed the timeline: "I've been asked to be in Dubai through the first week of February." He went on to explain, "There are no issues that I'm aware of. Just the process and subject to their respective schedules. I was told if no issues come up the funds can be moved following those dates."

s.  On February 19, 2018, according to the Rinde, the meetings still had not been completed: "As of now there is 1 last meeting I have been asked to attend. They are targeting Saturday but it is not yet confirmed."

t.  On February 26, 2018, Rinde once again said, "I have 1 further meeting which has been scheduled for March 18th and 19th." Desiata wrote back, "But Jeff there is always 'the last meeting' and then it happens and that is never the last... What are the issues now?" Rinde explained there were no issues, but did not clarify why there needed to be another meeting.

u.  On March 19, 2018, Rinde wrote Desiata, "Meeting is rescheduled for 25th." On March 27, 2018, Rinde wrote that the meetings were on ongoing.

v.  On April 7, 2018, Rinde wrote Desiata, "Everything was completed in Dubai. Banks are scheduled to speak on Monday and discuss procedures and protocols for transfer."

w.  Almost two weeks later, on April 23, 2018, Rinde wrote Desiata, "Waiting on confirmation of outbound transfer. [Everything cleared

on] Dubai side.  Will still need to deal with inbound/outbound compliance on US side."  In order to speed up and facilitate the process, Desiata asked whether funds could be sent directly to his account in Panama.  Rinde refused to entertain Desiata's suggestion, claiming, without providing a reason, that Plaintiffs' funds could not be sent to Panama, and instead had to go to CKR's account in the United States.

x.  A month later, on May 28, 2018, after Desiata sent multiple messages to Rinde asking for updates, Rinde wrote back, "I was informed the funds were released to CKR's bank.  I am waiting for confirmation this week of crediting of funds or requests from CKR's bank for compliance."  On June 28, 2018, Rinde wrote that he was still "just waiting on crediting of funds which is expected on or prior to July 2nd."  On July 15, 2018, Rinde said the funds still had not been credited to his account.

y.  On August 22, 2018, more than a year after Rinde represented he was attending meetings in Dubai to facilitate the transfer of funds, Rinde represented to Plaintiffs that he needed to attend more meetings, this time with his bank, Citibank, to have the transfer from Dubai credited to CKR's account.

z.  On September 6, 2018, Rinde wrote Desiata, "I was told everything has been resolved.  Simply waiting on Citi confirmation of release of funds."  By October 9, 2018, the funds, according to Rinde, still had

not been credited to CKR's account at Citibank and Rinde wrote that he was "waiting on file from Central Bank. Supposed to be delivered from embassy today."

aa. During the ensuing months, Desiata and Rinde continued to have similar exchanges: Desiata would ask for updates and Rinde would assure him that CKR's account would be credited with funds soon. In June 2019, Rinde told Desiata that he was continuing to communicate with Citibank about releasing the funds to his account. Subsequently, on July 21, 2019, nearly two years after he purportedly commenced his meetings in Dubai, Rinde changed the story again: "I'll receive an update early this week. There is a scheduled in person meeting with the Fed Reserve for Tuesday afternoon with the Middle East."

bb. On July 28, 2019, Rinde wrote to Desiata that the meeting in the Middle East had been rescheduled.

cc. On September 3, 2019, Rinde again gave Desiata an "update," but once again this "update" proved to be nothing more than informing Plaintiffs that the funds had not yet arrived.

41. To summarize, for five years Rinde represented, week after week, month after month, that the funds would be wired and credited to CKR's account in short order and then transferred to Plaintiffs. However, each claimed step forward was followed by new excuses for delay: each time Rinde represented that a transfer had occurred, Rinde then reported that there was a new round of bank scrutiny which Rinde could not seem to clear up; each time there was a "last meeting," there purportedly was another one later.

42. Upon information and belief, Plaintiffs' investments are now worth approximately $200,000,000, according to Defendants, with approximately $100,000,000 located in CKR's Citibank account in the United States and the remaining approximately $100,0000,000 in a foreign account in the Middle East. Plaintiffs are also still owed the return of their initial $700,000 investment.

43. Upon information and belief, Defendants are defendants in several other cases alleging similar patterns of fraud and deceit.

44. Plaintiffs have not received any distributions from the trading agreements or the Anderson Settlement Agreement. As a result, Desiata has lost money, had to sell equity in Panasolar at a lower price than initially intended, and personally owes debt he incurred trying to meet his business obligations. Dr. Pyne has lost the opportunity to become a ground-floor investor in a particular start-up, which is an opportunity he will likely not get back due to industry advances over the last five years, and, like Desiata, has not recovered even his initial investment.

45. Plaintiffs have been both proximately and directly harmed by Rinde and CKR's breaches of contract and fraudulent representations.

46. Furthermore, Rinde and CKR have been unjustly enriched by the retainer they received from Plaintiffs, as well as any funds they may have received through the trading agreements and the Anderson Settlement Agreement and retained.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (against Rinde and CKR)
### Breach of Contract

47. Plaintiffs repeat and re-allege each of the above averments.

48. Pursuant to the Initial Engagement Letter, Rinde and CKR agreed to represent AIZ on Plaintiffs' behalf, Dr. Pyne and Desiata in negotiating the lease and monetization of the SBLC, which would be used to fund Panasolar.

49. Pursuant to the Follow-Up Engagement Letter, Rinde and CKR agreed to represent the legal and financial interests of Panasolar, Dr. Pyne and Desiata in "monetizing [the SBLC and] facilitat[ing]" the receipt of funds from the monetization in exchange for a retainer fee.

50. Rinde and CKR breached these contracts when they failed to represent Plaintiffs' legal and financial interests by failing to monetize the SBLC, or, alternatively, by retaining for themselves the proceeds from the monetization of the SBLC, or, alternatively, Plaintiffs' funds forwarded to CKR's escrow account. In particular, over the past five years, Defendants have provided Plaintiffs with no distributions despite a promise that they would trade on the SBLC and distribute the resulting proceeds.

51. Plaintiffs performed all of their obligations under the Initial Engagement Letter and the Follow-Up Engagement Letter.

52. Plaintiffs performed all of the obligations of their predecessor in interest under the Initial Engagement Letter and Follow-up Engagement Letter.

53. As a direct and proximate result of Defendants' breaches of the Initial Engagement Letter and Follow-up Engagement Letter, Plaintiffs are entitled to recover the retainer fee due under the Engagement Letter, Plaintiffs' pro rata share of proceeds obtained pursuant to the three trading agreements plus interest, the $700,000 due to Plaintiffs pursuant to the Anderson Settlement Agreement plus interest, the proceeds promised by Defendants, and attorney's fees.

## SECOND CAUSE OF ACTION
### (against Rinde and CKR)
### Breach of Fiduciary Duty

54.     Plaintiffs repeat and re-allege each of the above averments.

55.     Pursuant to the Initial Engagement Letter, Rinde and CKR agreed to represent AIZ on Plaintiffs' behalf, Dr. Pyne and Desiata in negotiating the lease and monetization of the SBLC, which would be used to fund Panasolar.

56.     Pursuant to the Follow-Up Engagement Letter, Rinde and CKR agreed to represent the legal and financial interests of Panasolar, Dr. Pyne and Desiata in "monetizing [the SBLC and] facilitat[ing]" the receipt of funds from the monetization in exchange for a retainer fee.

57.     Rinde and CKR agreed to represent the legal and financial interests of Panasolar, Dr. Pyne and Desiata, in "monetizing [the SBLC and] facilitat[ing]" the receipt of funds from the monetization in exchange for a retainer fee.

58.     Additionally, Plaintiffs designated Defendants to receive and distribute the funds Plaintiffs were owed under the Anderson Settlement Agreement.

59.     Plaintiffs trusted Rinde and CKR to protect their financial interests and investments and to secure their funds and distribute them in a timely manner.

60.     Rinde and CKR failed to protect Plaintiffs' financial interests when they either failed to monetize the SBLC, or, alternatively retained the proceeds from the monetization of the SBLC for themselves.

61.     Defendants further failed to protect Plaintiffs' financial interests when they either failed to obtain the proceeds from the Anderson Settlement Agreement or, alternatively, retained the proceeds from the Anderson Settlement Agreement for themselves.

62.     As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiffs are entitled to recover the retainer fee due under the Engagement Letter, Plaintiffs' pro rata share of the proceeds obtained pursuant to the three trading agreements plus interest or, alternatively the pro rata share of the proceeds that Defendants represented would be obtained from the trading agreements, the $700,000 due to Plaintiffs pursuant to the Anderson Settlement Agreement plus interest, the proceeds promised by Defendants, any additional punitive amount to be determined at trial, and attorney's fees.

### THIRD CLAIM FOR RELIEF
### (against Rinde and CKR)
### <u>Fraud</u>

63.     Plaintiffs repeat and re-allege each of the above averments.

64.     Pursuant to the Initial Engagement Letter with Datwani, Rinde and CKR agreed to represent AIZ on Plaintiffs' behalf, Dr. Pyne and Desiata, in negotiating the lease and monetization of the SBLC.

65.     Pursuant to the Follow-Up Engagement Letter, Rinde and CKR agreed to represent the legal and financial interests of Panasolar, Dr. Pyne and Desiata, in "monetizing [the SBLC and] facilitat[ing]" the receipt of funds from the monetization in exchange for a retainer fee.

66.     Rinde and CKR defrauded Plaintiffs when soliciting and maintaining their business. Defendants had no intention of pursuing, and did not pursue, Plaintiffs' legal and financial interests.

67.     In particular, on several occasions Rinde and CKR knowingly and fraudulently misrepresented to Plaintiffs that the funds owed them under the trading agreements and Anderson Settlement Agreement would be available by certain deadlines, when in fact they were

aware that the funds would never become available to Plaintiffs.  These representations induced

Plaintiffs to forego alternative methods for obtaining the distributions due to them under the

trading agreements and Anderson Settlement Agreement, which exacerbated their losses.

68.     Alternatively, Defendants fraudulently presented to Plaintiffs a business

opportunity which Defendants knew could not and would not be as profitable as presented.

69.     As a direct and proximate result of Defendants' fraud, Plaintiffs are entitled to

recover the retainer fee due under the Engagement Letter, Plaintiffs' pro rata share of the

proceeds obtained pursuant to the three trading agreements plus interest, the $700,000 due to

Plaintiffs pursuant to the Anderson Settlement Agreement, or, alternatively the pro rata share of

the proceeds that Defendants represented would be obtained from the trading agreements, plus

interest, any additional punitive amount to be determined at trial, and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**(against Rinde and CKR)**
<u>**Unjust Enrichment**</u>

70.     Plaintiffs repeat and re-allege each of the above averments.

71.     Pursuant to the Initial Engagement Letter with Datwani, Rinde and CKR agreed

to represent AIZ on Plaintiffs' behalf, Dr. Pyne and Desiata, in negotiating the lease and

monetization of the SBLC, and Plaintiffs' interests.

72.     Pursuant to the Follow-Up Engagement Letter, Rinde and CKR agreed to

represent the legal and financial interests of Plaintiffs in "monetizing [the SBLC and]

facilitat[ing]" the receipt of funds and proceeds from the monetization and investment in the

trading platform in exchange for a retainer fee.

73.     Rinde and CKR were unjustly enriched when they either failed to obtain or

retained for themselves the distributions owed to Plaintiffs.

74.     To prevent Rinde and CKR from being unjustly enriched, Plaintiffs are entitled to recover the retainer fee due under the Engagement Letter, as well as any pro rata distributions due to Plaintiffs pursuant to the trading agreements and/or Anderson Settlement Agreement that Rinde and CKR may have retained.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Dr. Keith E. Pyne and Enrico Desiata respectfully pray that this Court will:

a)     Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages suffered, in an amount to be determined at trial;

b)     Award Plaintiffs punitive damages against Defendants, jointly and severally, in an amount to be determined at trial;

c)     Award Plaintiffs pre- and post-judgment interest;

d)     Award Plaintiffs their actual expenses of litigation, including reasonable attorneys' fees; and

f)     Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       February 22, 2021

                              MICHELMAN & ROBINSON, LLP

                              By:    */s/ Peter R. Ginsberg*
                                     Peter R. Ginsberg, Esq.
                                     800 Third Avenue, 24th Floor
                                     New York, New York 10022
                                     (212) 730-7700
                                     pginsberg@mrllp.com

*Attorneys for Plaintiffs*